**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| THE DOW CHEMICAL COMPANY, ROHM AND HAAS COMPANY, and ROHM AND HAAS CHEMICALS LLC | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 12090-VCG |
| ORGANIK KIMYA HOLDING A.S., ORGANIK KIMYA SAN. VE TIC. A.S., ORGANIK KIMYA US, INC., ORGANIK KIMYA LUXEMBURG S.A., and ORGANIK KIMYA NETHERLANDS B.V. | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Date Submitted: March 9, 2018
Date Decided: May 25, 2018

Rodger D. Smith II and Ryan D. Stottmann, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Charles K. Verhoeven, Raymond N. Nimrod, and James E. Baker, of QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, *Attorneys for Plaintiffs*.

Kathleen Furey McDonough, John A. Sensing, and Ryan C. Cicoski, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: J. Robert Robertson and Benjamin Holt, of HOGAN LOVELLS US LLP, Washington, DC, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

Opacity is to paint as lucidity is to legal writing: a quality to be strived for, if never fully achieved. According to the Complaint here, the Plaintiffs—The Dow Chemical Company and its subsidiaries, Rohm and Hass Company and Rohm and Haas Chemicals LLC—made significant advances in the production of opaque paint toward the end of the last century, advances with great commercial value. The Plaintiffs' formula and techniques are protected as trade secrets. Nonetheless, per the Plaintiffs, the Defendants, a Turkish chemical company and its affiliates, managed to hire ex-employees of the Plaintiffs and, through them, steal the trade secrets, to the Defendants' benefit and the Plaintiffs' detriment.

The Defendants moved to dismiss, on jurisdictional grounds and for failure to state a claim. I addressed the jurisdictional issues first, dismissing some of the corporate affiliates of the Turkish entity, but denying the balance of the jurisdictional motion.[1] This Memorandum Opinion addresses the Motion to Dismiss under Rule 12(b)(6). For the reasons that follow, that Motion is denied.

---

[1] *Dow Chem. Co. v. Organik Kimya Holding A.S.*, 2017 WL 4711931, at *10–12 (Del. Ch. Oct. 19, 2017).

1

# I. BACKGROUND[2]

## A. Parties

Plaintiff The Dow Chemical Company is a Delaware corporation headquartered in Midland, Michigan.[3] Plaintiff Rohm and Haas Company is also a Delaware corporation; its principal place of business is Philadelphia, Pennsylvania.[4] Plaintiff Rohm and Haas Chemicals LLC is a Delaware limited liability company headquartered in Philadelphia.[5] In April 2009, Dow acquired Rohm and Haas.[6] I sometimes refer collectively to the Plaintiffs as "Dow."

Defendant Organik Kimya San. ve Tic. A.S. ("Organik Kimya Turkey") is a privately held Turkish chemical company headquartered in Istanbul.[7] Non-parties Aldo Kaslowski, Simone Kaslowski, and Stefano Kaslowski serve as the sole members of the Organik Kimya Turkey board.[8]

Defendant Organik Kimya US, Inc. is a Delaware corporation headquartered in Burlington, Massachusetts.[9] Organik Kimya US is a wholly owned subsidiary of Organik Kimya Turkey.[10] Simone Kaslowski is Organik Kimya US's president; he

---

[2] The facts, drawn from the Complaint and other material I may consider on a motion to dismiss, are presumed true for purposes of evaluating the Defendants' Motion to Dismiss.
[3] Compl. ¶ 14.
[4] *Id.* ¶ 15.
[5] *Id.* ¶ 16.
[6] *Id.* ¶ 26.
[7] *Id.* ¶ 18.
[8] *Id.*
[9] *Id.* ¶ 21.
[10] *Id.*

and Stefano Kaslowski are its sole directors.[11] I refer to the Organik Defendants collectively as "Organik."

*B. Factual Background*

1. The Technology

This case stems from Organik's alleged scheme to steal Dow's trade secrets and other confidential information.[12] The proprietary information at issue involves recipes and manufacturing instructions for opaque and non-opaque polymers.[13] Opaque polymers are a form of emulsion polymer designed to hide the substrate beneath the surface of paint.[14] Non-opaque polymers are a different type of emulsion polymer.[15] As a result of its acquisition of Rohm and Haas, Dow obtained a substantial portfolio of trade secrets and other confidential information related to both opaque and non-opaque polymers.[16]

Since the late 1970s, Rohm and Haas has developed and refined a line of opaque polymers under the trade name ROPAQUE.[17] ROPAQUE polymers consist of hollow spheres with a water-filled void.[18] When paint containing ROPAQUE polymers dries, "the water in the void diffuses through the polymer shell and leaves

---

[11] *Id.*
[12] *Id.* ¶ 1.
[13] *Id.* ¶¶ 27–34, 43–45.
[14] *Id.* ¶ 27.
[15] *Id.* ¶ 43.
[16] *Id.* ¶¶ 26, 43.
[17] *Id.* ¶¶ 28, 30.
[18] *Id.* ¶ 29.

3

an air void that scatters light and facilitates hiding."[19] ROPAQUE was the first line of polymers to use trapped air to increase opacity, and over the years it has become increasingly successful in achieving opacity.[20] For example, the first generation of ROPAQUE polymers had a "void fraction" of approximately 20%, but by the mid to late 1990s, scientists at Rohm and Haas had discovered a technique that allowed them to significantly increase opacity.[21] That discovery led to the ROPAQUE Ultra line of polymers, which has dominated the industry since its introduction in the late 1990s.[22]

The ROPAQUE Ultra line of polymers is made using several trade secrets, which include confidential recipes and manufacturing instructions.[23] This body of information contains, among other things, directions regarding the "order of addition of chemicals, temperature, time and mixing speed."[24] The trade secrets also cover techniques used to streamline the process for manufacturing ROPAQUE polymers— for example, the equipment that should be used to maximize efficiency in the production process.[25]

---

[19] *Id.*
[20] *Id.* ¶ 30.
[21] *Id.* ¶ 31.
[22] *Id.* ¶ 32.
[23] *Id.* ¶ 33.
[24] *Id.*
[25] *Id.* ¶ 34.

4

All of these trade secrets have given Dow a leg up on the competition, and the information they embody is not generally known to others.[26] Moreover, Dow has taken several steps to protect the secrecy of its proprietary information.[27] Specifically, it (i) restricts access to the trade secrets to employees who have a demonstrated need for the information, (ii) imposes contractual confidentiality and non-disclosure obligations on employees with access to the trade secrets, and (iii) places anonymous identifiers on certain ingredients used to manufacture opaque polymers before they are shipped to manufacturing sites.[28]

### 2. The Scheme

Organik allegedly stole Dow's trade secrets by hiring several former Rohm and Haas employees, including Dr. Guillermo Perez, Leonardo Strozzi, and Dr. Dilip Nene.[29] Before he became the co-head of Research and Development at Organik, Dr. Perez had worked at Rohm and Haas for thirteen years; at the time of his departure, he was the Commercial and Technical Manager for Emerging Markets for Rohm and Haas's polymers and resins business.[30] Strozzi worked at Rohm and Haas for twenty-six years, serving as a Plant Manager at production facilities in Italy.[31] In

---

[26] *Id.* ¶¶ 35–36.
[27] *Id.* ¶ 37.
[28] *Id.* The Complaint contains substantively identical allegations about the trade secrets involved in manufacturing Dow's non-opaque polymers. *Id.* ¶¶ 44–48.
[29] *Id.* ¶¶ 39, 49.
[30] *Id.* ¶ 40.
[31] *Id.* ¶ 41.

September 2008, Strozzi became the Plant Manager of Organik's Rotterdam plant.[32]

Dr. Nene, who authored the original manufacturing instructions for ROPAQUE Ultra, worked at Rohm and Haas for twenty-seven years.[33] From 2008 to 2013, Dr. Nene performed consulting services for Organik.[34]

Dow appears to have learned of Organik's scheme through prior litigation between the parties before the US International Trade Commission (the "ITC").[35] Dow initially believed that Organik had infringed its patents related to ROPAQUE Ultra.[36] In the course of the ITC litigation, Dow came upon an email between two Organik employees that suggested Organik had stolen Dow's trade secrets from ex-Rohm and Haas employees.[37] Specifically, the email's metadata stated that, "[a]s a result of the recent meetings held with Dilip Nene, the information obtained about 'seed' and 'opac polymers' are summarized as follows."[38] Through the ITC litigation, Dow also learned that Organik had tried to cover its tracks via spoliation of evidence.[39] One Organik email stated that "[c]onfidential information related to

---

[32] *Id.*
[33] *Id.* ¶ 42.
[34] *Id.*
[35] *Id.* ¶¶ 2–3.
[36] *Id.* ¶ 3.
[37] *Id.*
[38] *Id.* (alteration in original).
[39] *Id.* ¶ 5.

the consultant are still recorded here, they were supposed to be erased by the IT department."[40]

Upon learning of the spoliation, Dow sought a forensic inspection of Organik's computers and networks.[41] The Administrative Law Judge (the "ALJ") presiding over the ITC proceedings granted Dow's request.[42] Yet Organik continued to engage in spoliation even after the inspection was ordered.[43] For example, four days before the scheduled forensic analysis of Dr. Perez's laptop, Organik overwrote 190 gigabytes of files on the computer.[44] The day before the inspection, Organik ran a program that deleted a large portion of the C drive and all of the D drive on Dr. Perez's laptop.[45] The Complaint contains several other examples of Organik's destruction of evidence.[46]

As a result of this spoliation, the ALJ entered a default judgment against Organik as to Dow's trade secret claims.[47] The ALJ found, among other things, that Organik had "spoliated, or permitted the spoliation, of massive amounts of evidence prejudicial to Dow's allegation of trade secret misappropriation in this

---

[40] *Id.* (alteration in original).
[41] *Id.* ¶ 6.
[42] *Id.*
[43] *Id.* ¶ 7.
[44] *Id.* ¶ 53.
[45] *Id.* ¶ 54.
[46] *Id.* ¶¶ 58–71.
[47] *Id.* ¶ 8.

investigation."[48]  In April 2015, the ITC affirmed the ALJ's ruling and granted Dow's request for a twenty-five year exclusion order.[49]  That order prohibits Organik from selling opaque polymers made with Dow's trade secrets in the United States for a period of twenty-five years.[50]  In February 2017, the United States Court of Appeals for the Federal Circuit affirmed the ITC's decision.[51]

Despite Organik's efforts to cover its tracks, Dow was able to uncover significant evidence of trade secret misappropriation.  For instance, forensic analysis of Strozzi's laptop revealed that several of the storage devices connected to the computer contained folders called "R&H."[52]  "These folders included hundreds of filepaths with names that appear to be Dow's highly confidential and proprietary documents and information, including . . . manufacturing instructions and recipes for opaque polymers and other polymers."[53]  Dow also discovered an internal Organik email stating that "[t]he guy provided free monomer ratios for R&H production runs."[54]  Dow alleged in the ITC proceedings that "the guy" was Dr. Nene.[55]  Moreover, Organik was required to give Dow the recipes for its OPAC 204x and ORGAWHITE 2000 products, which were allegedly produced using Dow's

---

[48] *Id.* ¶ 7.

[49] *Id.* ¶ 9.

[50] *Id.*

[51] *Organik Kimya, San. ve Tic. A.S. v. Int'l Trade Comm'n*, 848 F.3d 994, 996 (Fed. Cir. 2017).

[52] Compl. ¶ 61.

[53] *Id.*

[54] *Id.* ¶ 78 (alteration in original).

[55] *Id.*

trade secrets.[56] Dow's comparison of those recipes to its own manufacturing instructions revealed that Organik's products were made using Dow's trade secrets.[57]

Organik manufactures OPAC 204x and ORGAWHITE 2000 in Istanbul and Rotterdam.[58] But Organik markets, sells, and distributes these products throughout the world, including in the United States.[59] Organik's distribution of OPAC 204x and ORGAWHITE 2000 has harmed Dow, jeopardizing its opaque and non-opaque polymer business.[60]

*C. This Litigation*

Dow commenced this litigation on March 8, 2016. The Complaint contains six counts. Count I alleges misappropriation of trade secrets related to Dow's non-opaque and opaque polymers.[61] Count II alleges conversion resulting from Organik's theft and use of Dow's confidential information.[62] Count III alleges unfair competition, Count IV alleges tortious interference with a prospective business opportunity, and Count V alleges tortious interference with contract.[63] Finally,

---

[56] *Id.* ¶ 81.
[57] *Id.* ¶¶ 75, 81.
[58] *Id.* ¶ 72.
[59] *Id.* ¶ 93.
[60] *Id.* ¶ 86.
[61] *Id.* ¶¶ 88–95.
[62] *Id.* ¶¶ 96–99.
[63] *Id.* ¶¶ 100–14.

Count VI alleges that the Defendants were unjustly enriched by their misappropriation of Dow's proprietary information.[64]

On April 8, 2016, Organik moved to dismiss the Complaint, arguing that this Court lacked personal jurisdiction over several Organik entities and that the Complaint failed to state a claim for relief. I ordered jurisdictional discovery on June 7, 2016, and on October 19, 2017, I held that personal jurisdiction was proper over Organik Kimya Turkey, but not the other foreign Organik entities.[65] I deferred decision on Organik's remaining arguments for dismissal: that the Delaware Uniform Trade Secrets Act[66] ("DUTSA") displaces Dow's common law claims, and that DUTSA does not apply extraterritorially, and is therefore inapplicable to Dow's allegations of trade secret misappropriation.[67] I heard oral argument on those issues on March 9, 2018. This Memorandum Opinion addresses Organik's remaining arguments for dismissal.

## II. ANALYSIS

Organik has moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6). When reviewing such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences

---

[64] *Id.* ¶¶ 115–20.
[65] *Dow Chem. Co.*, 2017 WL 4711931, at *10–12.
[66] 6 *Del. C.* § 2001 *et seq.*
[67] *Dow Chem. Co.*, 2017 WL 4711931, at *13.

10

in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[68]

I need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[69]

*A. Extraterritoriality*

Organik argues that Dow's claim for misappropriation of trade secrets must be dismissed because DUTSA does not apply extraterritorially. According to Organik, because the Complaint does not specifically allege that any relevant conduct took place in Delaware, the presumption against extraterritorial application of statutes[70] requires dismissal of the trade secret claim. I disagree.

Delaware is a notice pleading state.[71] Under our pleading rules, "a plaintiff must put a defendant on fair notice in a general way of the cause of action asserted, which shifts to the defendant the burden to determine the details of the cause of action by way of discovery for the purpose of raising legal defenses."[72] Thus, to survive a motion to dismiss, a complaint "need only give 'general notice of the claim

---

[68] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).

[69] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).

[70] *See Singer v. Magnavox Co.*, 380 A.2d 969, 981 (Del. 1977) ("There is, of course, a presumption that a law is not intended to apply outside the territorial jurisdiction of the State in which it is enacted."), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983).

[71] *E.g.*, *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005).

[72] *Klein v. Sunbeam Corp.*, 94 A.2d 385, 391 (Del. 1952).

11

asserted.'"[73]  Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[74]  In line with Delaware's liberal notice pleading standards, Court of Chancery Rule 8(a)(1) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."[75]

An important consequence of Delaware's adoption of notice pleading is that a plaintiff is not required to plead the law.[76]  "So long as claimant alleges facts in his description of a series of events from which a [claim] may reasonably be inferred and makes a specific claim for the relief he hopes to obtain, he need not announce with any greater particularity the precise legal theory he is using."[77]  Delaware's approach to this aspect of pleading mirrors the federal rules, under which "it is unnecessary to set out a legal theory for the plaintiff's claim for relief."[78]  Indeed, "[t]here is no penalty for pleading legal theories under the federal rules except that overpleading might render the complaint vulnerable to attack by pretrial motion

---

[73] *Doe*, 884 A.2d at 458 (quoting *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998)).
[74] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011)
[75] Ct. Ch. R. 8(a)(1).
[76] *See In re EZCORP Inc. Consulting Agreement Derivative Litig.*, C.A. No. 9962-VCL, tr. at 82:11–19 (Del. Ch. Feb. 22, 2016) (TRANSCRIPT) ("If counsel has . . . failed to perceive the true basis of the claim at the pleadings stage -- in other words, to advance the legal theory that, for better or for worse, the trial court thinks is most apt -- that isn't fatal unless it is a late shift in the thrust of the case and would prejudice the other party in maintaining a defense on the merits.").
[77] *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979).
[78] 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1219 (3d ed. 2018); *see also Gregg v. Rowles*, 1992 WL 364759, at *1 (Del. Ch. Dec. 2, 1992) (noting that Delaware's rules of civil procedure are "based upon the federal rules" (citation omitted)).

12

should it show on its face that no claim for relief exists."[79]  Moreover, under the rules of this Court, pleading separate counts is required only where doing so "facilitates the clear presentation of the matters set forth" and the complaint sets out distinct claims premised on separate transactions or occurrences.[80]

Organik's extraterritoriality argument founders on these fundamental principles of notice pleading.  Count I of Dow's Complaint is labeled "Misappropriation of Trade Secrets."[81]  It alleges that Organik, through the conduct described in the body of the Complaint, has misappropriated Dow's trade secrets, thereby injuring Dow.  Organik does not argue that the Complaint fails to allege facts supporting the elements of a claim for trade secret misappropriation, either under DUTSA or any other jurisdiction's law.  For example, Organik does not suggest that Dow has failed to allege the existence of a trade secret, defined by DUTSA as "information" that "[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and that "[i]s the subject of efforts that are reasonable under the circumstances to maintain

---

[79] Wright & Miller, *supra*, § 1219.

[80] Ct. Ch. R. 10(b); *see also* Wright & Miller, *supra*, § 1324 ("[I]t seems reasonably clear that [Federal Rule of Civil Procedure] 10(b) does not make it necessary to use separate counts to state different theories of recovery or to seek relief under separate statutory provisions, although the pleader may choose to do so for clarity or out of caution." (footnote omitted)).

[81] Compl. at 33.

its secrecy."[82] Nor does Organik claim that the Complaint fails to allege the "acqui[sition], use[] or disclos[ure] [of] a trade secret obtained through improper means."[83]

Instead, Organik seizes on paragraph ninety-two of the Complaint, which alleges that Organik violated DUTSA by misappropriating Dow's trade secrets. According to Organik, Dow's citation to DUTSA is fatal to its trade secret claim, because the Complaint does not describe any Delaware-based conduct, and DUTSA does not apply extraterritorially. Organik misstates the inquiry on a Rule 12(b)(6) motion. The question is not whether the plaintiff has identified the correct legal theory for obtaining relief on the facts alleged. Indeed, the plaintiff is not required to cite statutes, caselaw, or any other legal materials in her pleading.[84] Rather, the question is whether the complaint alleges facts that "give general notice of the claim asserted."[85] Here, the Complaint provides more than adequate notice of the claim asserted, setting out in abundant detail (i) Organik's scheme to steal Dow's intellectual property and (ii) the nature of Dow's trade secrets.

---

[82] 6 *Del. C.* § 2001(4).

[83] *Savor, Inc.*, 812 A.2d at 897.

[84] *See Michelson*, 407 A.2d at 217 ("So long as claimant alleges facts in his description of a series of events from which a [claim] may reasonably be inferred and makes a specific claim for the relief he hopes to obtain, he need not announce with any greater particularity the precise legal theory he is using.").

[85] *Rabkin v. Phillip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104 (Del. 1985).

Organik's extraterritoriality argument is really a choice-of-law argument in disguise. Organik is correct that, at this stage of the litigation, it is unclear whether Delaware law applies to Dow's trade secret claim. In analyzing choice-of-law issues, Delaware courts apply "the most significant relationship test from the Restatement (Second) of Conflict[] of Laws."[86] The Restatement provides that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6."[87] The Restatement further provides four factors to consider in conducting a choice-of-law analysis in tort cases: "(1) 'where the injury occurred,' (2) 'where the conduct causing the injury occurred,' (3) the parties' 'domicil, residence, nationality, place of incorporation and place of business,' and (4) where the parties' relationship is centered."[88]

---

[86] *UbiquiTel Inc. v. Sprint Corp.*, 2005 WL 3533697, at *3 (Del. Ch. Dec. 14, 2005).

[87] *Restatement (Second) of Conflict of Laws* § 145(1) (1971). The Section 6 factors include "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." *Id.* § 6(2).

[88] *Tumlinson v. Advanced Micro Devices, Inc.*, 106 A.3d 983, 987 (Del. 2013) (quoting *Restatement (Second) of Conflict of Laws* § 145(2)). Notably, comment f. to Section 145 states that "the place of injury does not play so important a role for choice-of-law purposes in the case of false advertising and the misappropriation of trade values as in the case of other kinds of torts. Instead, the principal location of the defendant's conduct is the contact that will usually be given the greatest weight in determining the state whose local law determines the rights and liabilities that arise from false advertising and the misappropriation of trade values." *Restatement (Second) of Conflict of Laws* § 145 cmt. f.

15

Needless to say, the "most significant relationship" test entails a fact-intensive inquiry that often is inappropriate to a motion to dismiss.[89] Here, some of the infringing products were sold in unspecified locations in the United States, and some were sold in other parts of the world. Much of the injury-causing conduct appears to have taken place overseas, where the infringing goods were manufactured, although some of the relevant conduct may have occurred in the United States. The Plaintiffs are all Delaware entities. Dow's principal place of business is in Michigan, while the Rohm and Haas entities are headquartered in Pennsylvania. Organik Kimya Turkey is a Turkish company, and Organik Kimya US is a Delaware corporation headquartered in Massachusetts.

It should be apparent that, at this stage of the litigation, the choice-of-law question cannot be answered. But that does not require dismissal of Dow's trade secret claim. Forty-eight states and the District of Columbia have adopted the Uniform Trade Secrets Act ("UTSA").[90] The various versions of UTSA adopted by the states differ in several key respects (on which more below), but Organik has not argued that Dow's Complaint fails to allege the elements of a claim for trade secret

---

[89] *See, e.g.*, *Barrera v. Monsanto Co.*, 2016 WL 4938876, at *11 (Del. Super. Sept. 13, 2016) ("The parties have identified Michigan, New York, Texas and Missouri as jurisdictions that may prove relevant in the choice of law determination, but additional information to properly conduct a 'choice of law' analysis is required. . . . To date, the choice of law analysis has not been conducted and cannot be made on the limited facts and minimal record before it.").
[90] Melvin F. Jager, *Trade Secrets Law* § 3:29 (2018). Neither party has raised the possibility that non-US law could apply to this case.

16

misappropriation under any state's UTSA, or under the laws of Massachusetts and New York, the two states that have yet to adopt the Act.[91]

Dow has done everything necessary to survive a Rule 12(b)(6) motion on its trade secret claim. Through the detailed allegations of the Complaint, it has put Organik on "fair notice in a general way of the cause of action asserted, which shifts to [Organik] the burden to determine the details of the cause of action by way of discovery for the purpose of raising legal defenses."[92] Of course, Organik is free to make choice-of-law arguments at a later stage of the litigation. At the pleading stage, however, any choice-of-law concerns harbored by Organik are not grounds for dismissing the trade secret misappropriation claim.

*B. Preemption*

Organik seeks dismissal of the remainder of the Complaint on the ground that Dow's common law claims are preempted by DUTSA. DUTSA "displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret."[93] But DUTSA does not preempt "[c]ontractual remedies, whether or not based upon misappropriation of a trade secret," and it does not displace "[o]ther civil remedies that are not based upon

---

[91] *Id.*; *see also Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 773 (Del. Ch. 2014) ("If application of the competing laws would yield the same result, then no genuine conflict exists 'and the Court should avoid the choice-of-law analysis altogether.'" (quoting *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010))).

[92] *Klein*, 94 A.2d at 391.

[93] 6 *Del. C.* § 2007(a).

misappropriation of a trade secret."[94]  According to Organik, DUTSA's preemption provisions compel dismissal of Dow's claims for conversion, unfair competition, tortious interference with contract and prospective business relations, and unjust enrichment.  Given the uncertainty as to which jurisdiction's law applies, however, a ruling on preemption would be premature at this stage of the litigation.

States that have adopted UTSA are split on the Act's preemptive scope.[95] Courts in some jurisdictions have held that UTSA preempts all common law claims premised on misappropriation of information—even if that information does not rise to the level of a trade secret under the Act.[96]  Under this view, "non-trade secret information is not a protectable class of information and therefore common law claims that seek to protect it are preempted."[97]  Other courts have taken the opposite position, holding that "suits concerning confidential business information that are found not to be trade secrets are free to proceed on whatever state tort law claim the plaintiff can make out."[98]  In other words, so long as the information in question is

---

[94] *Id.* § 2007(b).

[95] *See, e.g.*, John T. Cross, *UTSA Displacement of Other State Law Claims*, 33 Hamline L. Rev. 445, 447 (2010) ("Section 7[, which contains UTSA's preemption provisions,] has been applied in numerous cases during its relatively short life. Notwithstanding the Commissioners' dreams of uniformity, the results in these cases exhibit a disconcerting lack of consistency. While a majority of courts agree that some claims are displaced and others not displaced, there are also a number of claims where the courts are split. Moreover, even where there is widespread agreement on the result, there is no consensus on the analysis to be applied under § 7. The result is a confusing array of conflicting precedent, leading to a lack of predictability." (footnote omitted)).

[96] *Atl. Med. Specialists, LLC v. Gastroenterology Assocs., P.A.*, 2017 WL 1842899, at *14 (Del. Super. Apr. 20, 2017).

[97] *Id.*

[98] *Id.* at *13.

not a trade secret, the plaintiff can pursue common law claims premised on misappropriation of that information without running afoul of UTSA's preemption provisions.[99]

The parties argue over which approach Delaware has adopted. Dow says that DUTSA only preempts common law claims that depend on establishing the existence of a trade secret. Dow's reading of DUTSA finds some support in the caselaw. For example, this Court has declined to hold a conversion claim preempted under DUTSA on the ground that the claim could succeed even if no trade secrets were established.[100] As the Court put it, "[i]f no trade secret was in fact at issue, . . . a conversion claim could still exist based on the misappropriation of confidential information—a finding of a trade secret is not an essential element of a conversion claim."[101] Organik, by contrast, argues that DUTSA preempts all common law claims based on the same facts alleged in support of a claim for trade secret misappropriation. Such preemption occurs, according to Organik, even if the common law claims could be proved without demonstrating the existence of a trade secret. Like Dow's interpretation of DUTSA, this view has some support in the Delaware cases.[102]

---

[99] *Id.*

[100] *Overdrive, Inc. v. Baker & Taylor, Inc.*, 2011 WL 2448209, at *5 (Del. Ch. June 17, 2011).

[101] *Id.*

[102] *E.g.*, *Atl. Med. Specialists, LLC, P.A.*, 2017 WL 1842899, at *15.

As Organik has noted, however, it may turn out that Delaware law does not apply to this case. In my view, that weighs in favor of deferring any preemption determination until discovery allows me to conduct a reasoned choice-of-law analysis. A hypothetical illustrates the wisdom of this approach. Suppose I adopt Organik's broad reading of DUTSA preemption and hold that Dow's common law claims are displaced. Suppose as well that, once discovery concludes, it emerges that Pennsylvania law governs this dispute.[103] Pennsylvania courts appear to take a narrow view of UTSA preemption, holding that the Act does not displace common law claims premised on theft of information that fails to rise to the level of a trade secret.[104] Thus, under Pennsylvania law, it may be inappropriate to dismiss Dow's common law claims before determining whether Dow can establish the existence of any trade secrets.[105] In this scenario, I would have rendered an advisory opinion on

---

[103] Dow argues in its opposition brief that, if Delaware law does not apply, Pennsylvania law should govern.

[104] *See, e.g.*, *EXL Labs., LLC v. Egolf*, 2011 WL 880453, at *8 (E.D. Pa. Mar. 11, 2011) ("If Plaintiff's conversion argument was solely based on misappropriation of trade secrets, PUTSA would preempt this claim. However, Plaintiff premises its conversion claim on misappropriation of both trade secrets and other confidential information. If we dismiss Plaintiff's conversion claim, and later determine that Plaintiff's confidential information does not constitute trade secrets, we risk leaving Plaintiff without a remedy."); *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 418 (E.D. Pa. 2009) ("While this claim [for unfair competition] would be preempted under Section 5308 of PTSA to the extent the information at issue is determined to be trade secret information, the claim may otherwise rest on confidential information which does [not] qualify for such status.").

[105] I do not decide here whether Pennsylvania in fact adheres to this approach to UTSA preemption. And I express no view at this juncture on the correct interpretation of DUTSA's preemption provisions.

the scope of DUTSA preemption.[106]   This Court does not render advisory opinions.[107]

Given the different approaches to UTSA preemption in the jurisdictions that have adopted the Act, and the uncertainty as to which state's law applies to this case, I decline to rule on the preemption question at this juncture.  Organik may raise the issue again via a motion for summary judgment or at trial, when the record is sufficiently developed to permit a choice-of-law determination.

### III. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss under Rule 12(b)(6) is DENIED.  The parties should submit an appropriate form of order that encompasses my rulings under both Rule 12(b)(2) and Rule 12(b)(6).

---

[106] In addition, if Massachusetts law applies, there would be no need to conduct a UTSA preemption analysis at all, because Massachusetts has not adopted the Act.  Jager, *supra*, § 3:29.  Application of Massachusetts law is not beyond the realm of possibility here; Organik Kimya US is headquartered in Massachusetts.

[107] *E.g.*, *XI Specialty Ins. Co. v. WMI Liquidating Trust*, 93 A.3d 1208, 1217 (Del. 2014).

21